J-S35045-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: X.M. AND K.J. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: B.T., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 334 WDA 2017 |

Appeal from the Order Entered January 30, 2017
In the Court of Common Pleas of Beaver County
Orphans' Court at No(s): JV 72 of 2014, Ocrt 3039 of 2016,
JV 91 of 2016, Ocrt 3040 of 2016

| | | |
|---|---|---|
| IN RE: X.M. AND K.J. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: B.T., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 335 WDA 2017 |

Appeal from the Order Entered January 30, 2017
In the Court of Common Pleas of Beaver County
Orphans' Court at No(s): Orphans Ct. 3040 of 2016 & 3039 of 2016

BEFORE: LAZARUS, J., RANSOM, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.: **FILED JUNE 1, 2017**

Appellant, B.T. ("Mother"), files this appeal from the order entered by the Court of Common Pleas of Beaver County terminating Mother's parental rights to two of her sons, X.M. (born in March 2006) and K.J. (born in July

_____

[*] Former Justice specially assigned to the Superior Court.

2013), pursuant to 23 Pa.C.S. § 2511(a)(5), (8), and (b). After careful review, we affirm.

The trial court provided the following summary of the factual background of the case:

> X.M. and K.J. were placed by Beaver County Children and Youth Services (CYS) in foster care on June 1, 2015. K.J. was two years old and nonverbal at the time of his placement; X.M. was ten years old at the time of his placement.[1] CYS was involved with the family since 2012 due to reports of mental health issues involving their Mother, B.T. Although there were multiple reports made to CYS since as early as January 12, 2012, and although CYS was monitoring the situation, Mother repeatedly refused services from 2012 through June 2015. The Court is unsure why a dependency action was not filed sooner. Ultimately, following an incident on June 1, 2015, CYS filed a dependency action, and the two boys, along with a brother, were formally placed with a foster family. The brother was later placed with his father and is not subject to this case.
>
> Mother's mental health issues have a long history, and apparently stem from multiple traumatic events, starting in childhood. She was raped, which resulted in a pregnancy; this is how X.M. was conceived. Mother has four children total. The two who are not subject of these termination actions are living with their fathers.
>
> On June 1, 2015, Mother had been living at the Women's Center in Beaver with three of her children. She left two of the children at the Center, unsupervised, and took a taxi to a wooded area with K.J. and a sledgehammer. After dropping Mother off near the woods, the taxi driver called the Women's Center to let them know that Mother had a sledgehammer. A counselor from the Women's Center found Mother in the woods trying to open a safe with the sledgehammer, with the child

---

[1] We observe that X.M., who was born in March 2006, was nine years old when he was removed from Mother's care.

nearby. Mother advised the counselor not to come near her, because her thoughts were hurting her. The counselor called the police, and they took Mother to Heritage Valley Beaver Hospital. Mother refused to allow K.J. to return to the Women's Center so he went with her to the hospital. All three children were placed in a foster home pending a search for relatives.

K.J.'s father has not been identified. X.M.'s father is incarcerated for 40 years at SCI Hunting[d]on. The third child's father was located, and again, that child went to live with his father.

On June 22, 2015, CYS was notified that Mother had sexually inappropriate with X.M. and the third child; Mother confirmed that the allegations were true. X.M. later disclosed that Mother had been abusing him since he was 6 years old. He was hit on numerous occasions with a variety of items, including a belt, hanger, and a skillet. Mother would pull his pants down and hit him very hard. On one occasion, prior to placement, Mother hit X.M. with a water gun so hard that it caused bruising to his face.

Mother remained hospitalized on a long-term involuntary commitment from June 1, 2015 to August 2015, at which time she was transferred to Friendship Ridge's Long Term Structured Residential Program (LTSR), in Beaver, Pennsylvania. From there, she moved to Cornerstone Rehabilitation Residence in Beaver Falls, Pennsylvania, in December 2015. She currently resides at this facility. She will need to be told by supportive housing when it will be appropriate for her to move to a less structured living environment. She does not have appropriate housing for the children to live with her and is on a waiting list for public housing.

Mother was following all recommendations of the family service plan for the last several months, which prompted her lawyer to file a motion seeking additional visitation with the children. The motion was filed in March 2016, and was continued until April 2016, but the court has unable to determine, from the evidence presented, whether increased visits would be appropriate. CYS relied on a report that was more than six months old. This Court ordered an evaluation of Mother and the children by an independent evaluator to determine whether visits should be increased, or whether they

would be detrimental to the children, given all they had been through. The evaluation did not occur until late 2016, and a report followed on October 11, 2016.

Dr. Patricia Pepe, Ph.D., a licensed psychologist at Allegheny Forensic Associates, met with Mother and the children and the foster parents in August 2016. She performed individual evaluations of each child and of Mother, and she did an interactional evaluation of the children with Mother and the foster parents. She issued a 23 page psychological evaluation report, detailing the history of the case, her observations, and conclusions.

Based on the results of the evaluation and the history of the case, CYS moved to change the goal from reunification to adoption and filed a petition to terminate Mother's parental rights. The hearing to change the goal was held on September 2, 2016, at which time Mother withdrew her request for increased visitation[.]

Trial Court Opinion (T.C.O.), 1/31/17, at 1-4 (footnotes omitted).

On November 11, 2016, the trial court held a hearing on the petition to terminate Mother's parental rights. CYS presented the testimony of Dr. Pepe and caseworker Jodi Pavlinch. Mother chose not to call any witnesses. In a final decree filed on January 30, 2017, the trial court terminated Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(5), (8), and (b).[2] On February 22, 2016, Mother, through appointed counsel, filed a notice of appeal, along with a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).

On appeal, Mother raises four issues for our review:

_____

[2] CYS also filed for termination of the children's fathers' parental rights, which the trial court granted. The fathers chose not to appeal those orders.

- 4 -

I.      Whether the Honorable Court erred or abused its discretion by terminating Mother's parental rights with regards to both children when the evidence presented was insufficient to support a finding by the Honorable Court that [CYS] established by clear and convincing evidence that [Mother's] parental rights should be terminated under 23 Pa.C.S. § 2511(a)(5) and (8)?

II.     Whether the Honorable Court erred or abused its discretion by terminating Mother's parental rights with regards to both children when the evidence presented clearly showed the Mother, using all available and reasonable services, had remedied the conditions which led to the removal in a sufficient amount of time?

III.    Whether the Honorable Court erred or abused its discretion by terminating Mother's parental rights with regard to K.J. based solely upon the insufficient evidence that was presented regarding X.M.?

IV.     Whether the Honorable Court abused its discretion in terminate [sic] the rights of Mother with regard to both children when the evidence presented by [CYS] was insufficient to support a finding by the Honorable Court that the termination of Mother's parental rights would best serve the needs and welfare of the children under 23 Pa.C.S. § 2511(b) in that the Honorable Court did not assess the needs of the children individually?

Mother's Brief at 6.

In matters involving involuntary termination of parental rights, our standard of review is as follows:

> The standard of review in termination of parental rights cases requires appellate courts "to accept the findings of fact and credibility determinations of the trial court if they are supported by the record." ***In re Adoption of S.P.***, [616 Pa. 309, 325, 47 A.3d 817, 826 (2012)]. "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." ***Id.*** "[A] decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will."

> *Id.* The trial court's decision, however, should not be reversed merely because the record would support a different result. *Id.* at [325-26, 47 A.3d at] 827. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. *See In re R.J.T.*, [608 Pa. 9, 26-27, 9 A.3d 1179, 1190 (2010)].

*In re T.S.M.*, 620 Pa. 602, 628, 71 A.3d 251, 267 (2013). "The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re M.G. & J.G.*, 855 A.2d 68, 73-74 (Pa.Super. 2004) (citation omitted). "[I]f competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result." *In re Adoption of T.B.B.*, 835 A.2d 387, 394 (Pa.Super. 2003) (citation omitted).

The termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S. §§ 2101-2938, and requires a bifurcated analysis of the grounds for termination followed by the needs and welfare of the child.

> Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

***In re L.M.***, 923 A.2d 505, 511 (Pa.Super. 2007) (citations omitted). Clear and convincing evidence is defined as that which is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." ***In re C.S.***, 761 A.2d 1197, 1201 (Pa.Super. 2000) (*en banc*) (quoting ***Matter of Adoption of Charles E.D.M. II***, 550 Pa. 595, 601, 708 A.2d 88, 91 (Pa. 1998)).

In the case *sub judice*, the trial court terminated Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(5) and (8), as well as (b), which provide as follows:

> **(a) General rule.**--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> (5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.
>
> * * *
>
> (8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

* * *

**(b) Other considerations**.--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(5), (8), (b).

This Court has discussed the grounds for termination of parental rights

under Sections 2511(a)(5) and (8):

Termination of parental rights under Section 2511(a)(5) requires that: (1) the child has been removed from parental care for at least six months; (2) the conditions which led to removal and placement of the child continue to exist; and (3) termination of parental rights would best serve the needs and welfare of the child. 23 Pa.C.S.A. § 2511(a)(5). "[T]o terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(8), the following factors must be demonstrated: (1) the child has been removed from parental care for 12 months or more from the date of removal; (2) the conditions which led to the removal or placement of the child continue to exist; and (3) termination of parental rights would best serve the needs and welfare of the child." *In re Adoption of M.E.P.,* 825 A.2d 1266, 1275–76 (Pa.Super.2003); 23 Pa.C.S.A. § 2511(a)(8). "Section 2511(a)(8) sets a 12–month time frame for a parent to remedy the conditions that led to the children's removal by the court." *In re A.R.,* 837 A.2d 560, 564 (Pa.Super.2003). Once the 12–month period has been established, the court must next determine whether the conditions that led to the child's removal continue to exist, despite the reasonable good faith efforts of the Agency supplied over a realistic time period. *Id.* Termination under Section 2511(a)(8) does not require the court to evaluate a parent's current willingness or ability to remedy the conditions that initially caused placement or the availability or efficacy of Agency

- 8 -

services. *In re Adoption of T.B.B.,* 835 A.2d 387, 396 (Pa.Super. 2003); *In re Adoption of M.E.P., supra.*

*In re Z.P.*, 994 A.2d 1108, 1118 (Pa.Super. 2010).

Moreover, this Court has emphasized that:

The statute permitting the termination of parental rights outlines certain irreducible minimum requirements of care that parents must provide for their children, and a parent who cannot or will not meet the requirements within a reasonable time following intervention by the state may properly be considered unfit and have his parental rights terminated. *In re B.L.L.,* 787 A.2d 1007, 1013 (Pa.Super. 2001).

*In re Z.P.*, 994 A.2d at 1118.

Our review of the record shows that the children were taken into custody by CYS on June 1, 2015. Prior to the children's placement, Mother admittedly subjected X.M. to physical and sexual abuse and neglected both children's physical and emotional needs. The Orphans' Court relied on the testimony of Dr. Pepe who conducted in-depth evaluations of the children and Mother:

Dr. Pepe stated in her report, and testified, that she did not believe the children should have increased visits with their Mother. Instead, she concluded that the children were suffering from severe trauma and should not return to Mother.

With respect to X.M., Dr. Pepe observed that he was credible in his description of multiple events that included being beat with a belt, hanger, and skillet. He was hit with a water gun so hard, that he got a black eye. X.M. believed his Mother was going to set him on fire and that his Mother sexually abused him. He stated that he was so scared of her that he has had repeated nightmares and he has many symptoms of post-traumatic stress disorder [(PTSD)]. He suffers from anxiety, child abuse, sexual abuse, and neglect. With respect to neglect, the children did not have enough food on many occasions. When the children were first placed, they would go through the

garbage to look for food, and would take frozen food out of the freezer to the bathroom to eat it.

* * *

Dr. Pepe also [found] the results of Mother's personality test were concerning… The combination of scores indicated that she had a lack of concern for social or aggressive behaviors, and continues to suffer from psychosis that can lead to aggressive behavior. … These are deep seeded personality issues that will take her a long time to address. For this reason, there are ongoing safety concerns. Mother was psychotic when she was touching herself (in the genital area) and then putting her hand in X.M.'s mouth. If she is not compliant with her medication, she will likely continue to suffer from this psychosis. Her mental health is very fragile. The trauma she sustained as a child continues to impact her. She has been found to be a perpetrator of physical abuse of these children.

T.C.O. at 4-6. Mother has been specifically diagnosed with bipolar disorder and schizoaffective disorder.

Notwithstanding the fact that the children have been in placement for nearly two years, the record supports the notion that Mother's mental health issues continue to exist. The trial court emphasized that as Mother had caused the children to suffer great trauma through her abuse and neglect, there is no evidence that Mother's efforts to remedy the circumstances that led to the removal of her children have been or can be successful.

We agree that Mother's mental health issues will prevent her from being able to meet the needs of the children within a reasonable period of time. Although the trial court acknowledged that Mother sought mental health treatment upon the children's placement and Appellant has not had a psychotic episode since that point, Dr. Pepe noted that Mother has deep-seated personality issues that will take an extended period of time to

address.  As Mother "continues to exhibit significant symptoms of psychosis" and shows a lack of concern for social and moral standards of behavior, Dr. Pepe felt "there's a very great risk of [her] continued ability to harm the children."  N.T. 11/11/16, at 36.  Moreover, the trial court recognized that Mother must remain compliant with her medication to avoid a relapse; Mother's ability to consistently regulate herself with the medication is untested as she had been unmedicated for the previous nineteen years.

Moreover, since the children's placement, Mother has been unable to care for them due to her long-term involuntary commitment in a psychiatric hospital and her subsequent stay in a residential program.  While Mother appears to be seeking public housing, it is unclear whether her counselors at her current treatment program have found it appropriate for her to move to a less structured environment in which she will be solely responsible for consistently continuing her medication and her therapy. While Mother has complied with the objectives in her family service plan, her attempt to remedy the circumstances that led to the children's placement has been unsuccessful.

The record also supports the trial court's finding that termination of Mother's parental rights would best serve the needs and the welfare of the boys.  As noted above, although Dr. Pepe had been asked to evaluate Mother and the children determine whether Mother could have increased visitation with the children, Dr. Pepe instead concluded that the children

should never return to their mother's care based on the trauma that Mother had inflicted.

In comparison, the children now live in a foster home together where they are thriving. Dr. Pepe noted the dramatic differences in the children's behavior when they are with their foster parents. We agree with the trial court that the children's best interest is served by their placement with this foster family that provides them with permanency and safety. Thus, as the trial court's determinations regarding sections 2511(a)(5) and (a)(8) are supported by competent, clear and convincing evidence in the record, we find no abuse of discretion. *See In re T.S.M.*, 620 Pa. at 628, 71 A.3d at 267; *In re Adoption of T.B.B.,* 835 A.2d at 394.

After concluding that the grounds for termination of Mother's parental rights under Section 2511(a) are met, we now must analyze whether termination is proper under Section 2511(b), which requires courts to "give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." *In re K.M.*, 53 A.3d 781, 791 (Pa. Super. 2012).

Moreover,

> As this Court has explained, "Section 2511(b) does not explicitly require a bonding analysis and the term 'bond' is not defined in the Adoption Act. Case law, however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered" as part of our analysis. *In re*

- 12 -

> **K.K.R.–S.**, 958 A.2d 529, 533 (Pa.Super. 2008). "While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child." **In re N.A.M.,** 33 A.3d 95, 103 (Pa.Super. 2011) (citing **K.K.R.–S.,** 958 A.2d at 533–36).
>
>> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.
>
> **Id**. (quoting **In re A.S.,** 11 A.3d 473, 483 (Pa.Super. 2010)); **see also In re T.D.,** 949 A.2d 910, 920–23 (Pa.Super. 2008), *appeal denied,* 601 Pa. 684, 970 A.2d 1148 (2009) (affirming the termination of parental rights where "obvious emotional ties exist between T.D. and Parents, but Parents are either unwilling or unable to satisfy the irreducible minimum requirements of parenthood," and where preserving the Parents' rights would prevent T.D. from being adopted and attaining permanency).

**In re Adoption of C.D.R.**, 111 A.3d 1212, 1219 (Pa.Super. 2015).

Our courts have recognized that "pathological" emotional bonds may exist between children and parents who have proven incapable of parenting. In **In re T.S.M.**, our Supreme Court reversed the trial court's denial of a petition to terminate a mother's parental rights to five of her seven children, finding that the trauma caused by breaking their unhealthy, "pathological" bond was outweighed by the benefit of moving the children toward permanent homes. **In re T.S.M.**, 620 Pa. at 634, 71 A.3d at 270-71. Evidence in that case showed the children were bonded to Mother even though two of the children experienced life-threatening incidents due to her

neglect, the children admitted that their mother hit them with belts and hangers, and the children witnessed their mother smoking marijuana and having sexual relations with her paramour. The Supreme Court discussed this Court's precedent analyzing termination cases where pathological bonds exist between children and their parents:

> The Superior Court has emphasized that the mere existence of a bond or attachment of a child to a parent will not necessarily result in the denial of a termination petition. Instead, as Judge Tamilia eloquently observed while speaking for the court, it is "an immutable psychological truth" that "[e]ven the most abused of children will often harbor some positive emotion towards the abusive parent." *In re K.K.R.-S.,* 958 A.2d 529, 535 (Pa.Super. 2008). Thus, Judge Tamilia cautioned against denying termination of parental rights based solely on the fact that a child has an attachment to the parent: "The continued attachment to the natural parents, despite serious parental rejection through abuse and neglect, and failure to correct parenting and behavior disorders which are harming the children cannot be misconstrued as bonding." *Id.* at 535 (quoting *In re Involuntary Termination of C.W.S.M.,* 839 A.2d 410, 418 (Pa.Super. 2003)) (Tamilia, J., dissenting).

*Id*. at 629, 71 A.3d at 267 (footnote omitted).

In this case, although the orphans' court found that the children have a bond with Mother, it recognized that "this bond is deeply affected by the trauma they have endured at the hands of their Mother." T.C.O. at 6. The trial court and Dr. Pepe focused on the severe psychological trauma and possible permanent damage X.M. sustained through Mother's physical beatings, sexual abuse, and neglect. The trial court could not ignore X.M.'s expressed fear of Mother and his adamant request to never again have unsupervised visitation with her. Specifically, the trial court noted that:

> [Dr. Pepe noted that] X.M. remains extremely fearful of Mother and insists that any visits be supervised. He does not want visits to be increased; he is fearful that his Mother will want him to come and live with her again. He understands that his Mother is "mentally sick." His PTSD symptoms interfere with his ability to engage in age appropriate activities on a daily basis. He often becomes tearful at school and needs time to leave the classroom to gather his composure. The psychologist opined that if X.M.'s visits were not increased, and, if he were able to remain in the current placement <u>permanently</u> while continuing to engage with both mobile therapy and trauma based therapy, then X.M. <u>may</u> have a chance to survive and succeed. Dr. Pepe noted that she could not underscore the amount of psychological pain the child has endured and the level of psychological pain he continues to experience on a daily basis.

T.C.O. at 4-5. With regard to healing from these traumatic experiences, Dr. Pepe opined that X.M., given his level of psychological and social impairment, will need years to reach age appropriate functioning and will likely have permanent psychological scars.

The trial court recognized that K.J. will likely be more resilient given that he was only two years old when removed from Mother's care and the fact that he was not physically abused by her. While K.J. could not verbalize any concerns due to his age, Dr. Pepe observed that K.J. displays developmental delay that is likely due to his experience of neglect. The trial court emphasized Dr. Pepe's finding that "[n]either child is functioning [in] an age appropriate manner due to trauma and neglect." T.C.O. at 5. The trial court expressed concern about the children's safety, comfort, and stability in the face of doubt about whether Mother is capable of caring for them, given her mental health condition.

Moreover, the trial court emphasized that the children are doing well in their foster home and have bonded with their foster parents. The trial court highlighted Dr. Pepe's observation of notable differences of the children's behavior while with Mother or their foster parents. During an evaluation with Mother, X.M. exhibited fear of her, as he tried to move closer to Dr. Pepe and away from Mother. When with his foster parents, X.M.'s demeanor was radically different as he became relaxed and enjoyed himself. In the same manner, K.J. was much more "engaging and animated with his foster parents." T.C.O. at 6.

Based on the foregoing evidence, we agree with the trial court's conclusion that "[a]ny trauma caused by breaking the bond [X.M. and K.J. have] with their natural Mother is outweighed by the benefit of moving the children toward a permanent home." T.C.O. at 7. *See In re T.S.M.*, *supra*. We conclude that termination of Mother's parental rights best serves the children's needs and welfare to allow them to move towards permanency in their foster home. Accordingly, we affirm the order terminating Mother's parental rights.

Order affirmed. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 6/1/2017